May it please the court, counsel, co-counsel, Mr. Harlan, my name is Dave Nelson, I represent This is a case about a young father who was killed only steps from his front door and in front of his mother who looked on helpless to assist him. The district court below granted defendant summary judgment. In doing so, it erred. Members of the panel, you should send this case back to trial. On behalf of a fatherless child and his grieving parents, I will give you the reasons for doing so. Members of the panel, the district court struck each and every claim for the same reason. In each instance, for each claim, the court stated that the claim required expert testimony. That's wrong. There were some additional reasons for dismissing two of the claims out of the three, and I will address those in turn. But I wish to begin where the court did with the design defect claim. The court held that the design defect claim required expert testimony because it's a complex product and there were multiple potential causes of injury. Now, the court did say that there was an independent basis for dismissing that claim. Namely, that the plaintiff lacked admissible evidence to raise an issue of fact on that design defect claim. That second basis is also an error. Did the court dismiss any of the claims on the basis of failure proof of causation? No, sir. And I think it's important at this time to point out that on that subject of causation, that is, we have an expert. We have an expert's report, some 85 pages in length, that describes in excruciating detail how the product killed Stanley. This is the excluded expert? There's potentially a little confusion. The warnings, there is an expert, Zipes. There is a second expert who was excluded on medical causation. It's potentially confusing, Judge, because there is a portion of Dr. Zipes' testimony, he was offered up as a warnings expert, that was excluded. So we have an independent medical doctor expert that was excluded. And we have a portion of Dr. Zipes' testimony on warnings that was excluded. What was the evidence that was submitted on the efficacy of a warning? The principal evidence in the case on warnings is there was no warning. No warning at all. And we would concede . . . Did the district court require that there be proof that if there had been a warning, it would have mattered? It did improperly. It did improperly. The plaintiff was entitled to a heeding presumption, but the court didn't give us that presumption. In this instance, there was no warning given whatsoever. It's worth mentioning that at this juncture, Taser does warn. It warns of precisely the hazard that struck Stanley down. It started warning a year after the death. The warning exists now. Going forward, officers are on notice. If someone were to bring a claim, Judge, to speak to your concern today about the adequacy of the present warning, that, I believe, would require expert testimony. But in the absence of any warning whatsoever to these officers, and in the presence of a heeding presumption, we don't need an expert. Those clarifying . . . Now, you keep saying no warning. I thought, and I haven't studied the record sufficiently, I thought Taser provided the same warning, lengthy warning, that's quoted in the Rosa opinion. The officers who were present at the death of Stanley Harlan, the officers who deployed the Taser, had been told most recently in April of 2008, Stanley was killed in August of 2008, that this product in real world usage . . . That wasn't my question. You keep saying this is a no warning case, therefore all the other cases are distinguishable, and you've said it twice this morning. I won't say it again. When the product was sold, it wasn't the same warning given as is quoted in Rosa. You can go on from there, but it's just a yes or no. No, sir. No? I don't believe so. Do we know what the product packaging, labeling, and so forth contained? In 2004? Yes, sir. We do. It contained . . . And that at all times in question, Taser provided warnings that read in relevant part. That's not this case? That does not describe the risk of VF, that warning in front of you, sir. The risk of what? Ventricular fibrillation. Oh, so there was a warning, but it didn't name every single risk. It didn't say, for example, it might incapacitate an arm or whatever could happen. So when you say no warning, you mean no warning as to the specific risk that's at issue here, not no warning. Am I right? I think that's fair, Your Honor. Okay. Then I understand your position, but it's not a no warning case in my view. You're right. And let me try to . . . Well, then let's not call it that. Okay. Let me relabel it. It's a no warning of cardiac arrest case. That's the method. Pardon me. That was the way to death in this case. Dr. Zipes' report describes and outlines how this product kills. First, the probes send electricity into the heart. Let's stay with the legal. I'm just clarifying something. Sure. Do you have a question? I'm sorry. No, I mean you were going into factual detail. Time is short. We were talking about the legal arguments. There was no warning that the probes could capture the heart rate, leading inevitably to VF, leading to asystole, leading to death. That's a cardiac event that was never warned of. I understand that. But it wasn't a no warning product. It was a warning of dangers in general. That's right. Dangerous product in general without doing what we see on TV all the time and naming every single thing that anybody has ever had go wrong from this, usually a pharmaceutical product. Right. The warnings were, for example, don't shoot in the eyes. That makes sense. Maybe it wasn't. That makes sense. They needed a warning pertaining to the heart and they didn't have it. Just go on with your argument. I didn't mean to have a lengthy interruption. I'm sorry. I will then return to the design defect claim and that easy to explain error by the court. The court used a universal qualifier and said that the plaintiff relies only on two things, only on two pieces of inadmissible evidence. That's wrong. In fact, it's patently false. Bearing in mind that under Missouri law, circumstantial evidence can underwrite a design defect case, here's a list of what was in the record. The mother's eyewitness testimony, that's Exhibit 512. The sworn testimony of the two officers who were present, Brayfogle and Dodson, Exhibits 325 and 324, respectively. Exhibits 2A and B, full audio and partial video. The video shows most everything. Let me just stop there. If a witness, a bystander, were to testify that they saw somebody fire a weapon, the ordnance entered the chest of the victim, the victim screamed, the victim fell to the ground, the victim failed to respond, lost consciousness, stopped breathing, their heart stopped, and they died, no one would doubt, no one would question, that that witness's testimony was at least circumstantial evidence that that weapon was dangerous to the victim. That's what we have here. That's what those officers testified to. That's what the mother saw and testified to. In addition to that eyewitness testimony. Was that even contested? What, sir? Was it contested? Wasn't it undisputed that there are dangers involved in use of the taser? That wasn't at issue, was it? The danger, Your Honor, was the danger of death. And from the beginning and to this day, the product is marketed as nonlethal. The danger is death. It's allegedly, purportedly a nonlethal product. That's the crux of the matter. This product is not designed to kill. Or said another way, it is designed not to kill. If it were a product designed to kill, in the marketplace it would compete with guns, which are cheaper to own and cheaper to maintain and, by the way, more lethal. It is axiomatic that a product that is marketed, purportedly designed to be nonlethal, but nonetheless kills, is a dangerous product, an unreasonably dangerous product. Counsel, there are many products that are marketed with no intent for fatalities that have danger involved with them. There are accidents that occur with innocuous products.  Under Missouri law, unreasonably dangerous equals defective. Under Missouri law, if we prove it's unreasonably dangerous, it's defective. A gun, a standard .45, is not unreasonably dangerous. Just give me the Supreme Court of Missouri, the leading case for that proposition. Sure. It's not Stinson. It's because Stinson was a subsequent appellate case. One moment, Your Honor. Perhaps you could have a letter afterwards that you would give the citation to that. Perhaps you would send a letter, a 28-J letter, with that citation later rather than look it up now.  Your Honor, forgive me. Are you contending that it doesn't matter that Judge Hamilton excluded the expert evidence? Are you contending it doesn't matter that Judge Hamilton excluded your expert's evidence? In the failure to warn case, yes, I am. It did not matter because we didn't need it. And to step back for a minute, forgive me. Elmore is the name of the case, Your Honor. Sorry, I momentarily forgot it. There are three cases on that point that are important for you to read. Stinson, Elmore, and Smith. Smith is a tobacco case. Elmore is an asbestos case. And the last is an isocyanate fumes case called Stinson. They all stand for that proposition. The plaintiff need not but did offer, to answer your question, Judge, an adequate warnings expert. The judge, the court below, refused to accept his testimony on warnings. For reasons in our brief, I believe that Dr. Zipes is more than qualified to be the warnings expert here. In fact, far better qualified than what one can only guess would be an expert in arms, such as using pepper spray or batons. An expert in electrocardiophysiology who has written warnings for medical devices that affect the heart through the use of electricity is the best suited of all to write a warning in plainest view. I've reserved four minutes. Thank you, Your Honor. What was his experience in law enforcement? He has no experience. Dr. Zipes has no experience in law enforcement. Ms. Peterson? Good morning, Your Honors. May it please the Court, my name is Pam Peterson, and I represent Taser International. From a decision tree analysis, the most direct route to affirmance of Judge Hamilton's summary judgment ruling is this. First, the court should find that this is a warnings case, not a design defect case, and that plaintiff's failure to identify a defect in Taser's X26 design itself or to present any evidence, lay or expert, that the X26 is unreasonably dangerous as designed is fatal to that claim. And second, that plaintiff has failed to meet her burden to prove warnings causation as a matter of law because Officer Baird never read the applicable warnings. It is undisputed in this case that at the time of Officer Baird's ECD training in October of 2007, that Taser's version 13 training materials and March 1, 2007, warnings document, a four-page separate document specifically for law enforcement warnings relating to the use of this product, that those were in effect and that they were not used during Officer Baird's training and that he has never seen them. Under applicable law, there is no warnings causation when a user has never read the warnings to begin with. The issue about whether or not they're adequate or not or contained a warning that plaintiffs say should have been in there or not simply doesn't matter when they've never been read in the first instance, and that's exactly what happened here. Taser is not required as a manufacturer, obviously, to train officers, but it has, to its credit, adopted an extensive training program and has set up protocols to ensure that end users actually get its warnings. It requires its certified Taser trainers. If they're going to use Taser's copyrighted training materials, to use those materials in full, to go to Taser's website 72 hours in advance of any training and download the most current warnings and trainings documents. Excuse me, but are you talking about the warning system that existed at the time of this incident? Yes, Your Honor, I am. And so the gentleman who trained for the Moberly Police Department, Sergeant Link, was a Taser ECD certified trainer. He was the one who then was responsible for training officers within the Department of Moberly. Taser doesn't train end users. It trains the trainers. Those trainers are specifically directed to 72 hours before any training to go to the website and be sure that they're using the most current training version and warnings documents. The PowerPoint presentation that is used, version 13, that should have been used during Officer Baird's training, has a slide in it that specifically says, are Taser devices risk-free? No. Copy and hand out Taser's four-page warning document now before proceeding with the course. This sergeant, this trainer, did not do that. His testimony is unequivocal that he did not download and did not have version 13, that he had never seen the March 1, 2007 product warnings, that he did not provide those to Officer Baird, that he did not play the PowerPoint presentation, did not show any of the training videos embedded in that PowerPoint presentation, and that following Officer Baird's training in October of 2007, he never provided any additional training bulletins or warning information from Taser that he received to Officer Baird. So is it your position that on these facts, it really doesn't matter whether your warning was adequate or not, there was no warning that was heeded, period? That's exactly right. Under the key cases in this regard, there's two Johnson cases. There's Johnson v. Medtronic, which is a 2012 Missouri Court of Appeals decision, and then this court's decision in 1981 in Johnson v. Niagara Machine and Tool. Both of those cases specifically hold that the adequacy of a warning necessarily presupposes that the operator had read the warning. And in the Missouri case, this was a situation where summary judgment was granted to the product manufacturer because the doctor that used the defibrillator failed to read the warnings. And because he failed to read the warnings, there was no causative effect from a warnings causation perspective in terms of the cardioversion outcome for that patient. So those cases are clear. The best crafted warning or instructions imaginable are simply futile if the user never read them. And because the user here unequivocally did not read them, never saw them, that is a basis for summary judgment on the strict liability warnings claim as a matter of law. It also, on the negligence side, because the warnings causation elements for strict liability negligence are the same. If they fail for strict liability, they fail for negligence. And this all rebuts the presumption of heeding, is that right? I mean, that's your position? There are two different warning causation issues, the first one being the failure to read the warnings at all, which the presumption doesn't apply in that situation. But the second one deals with the lack of evidence. Plaintiffs absolutely presented no evidence whatsoever that a different or additional warning by TASER would have made any difference in the outcome here. They relied specifically on the heeding presumption in that inquiry in terms of whether the officer would have done anything different or not. Well, what's your best authority that the heeding presumption doesn't apply here? Well, it applies in, well, the heeding presumption on the issue of would a different warning have changed the conduct? In those circumstances, if plaintiff satisfies its initial burden to show that the officer didn't have knowledge, then the heeding presumption would normally apply to that inquiry, that's separate from the he never read them to begin with. But in that instance, it's a rebuttable presumption. The law is very clear for that. In the Johnson v. Medtronic case, the court there rejected the proposition that plaintiffs set forth that the jury should always be allowed to determine whether some better or different or greater warning should have been given, and you have to have evidence. So you have the benefit of the heeding presumption if it applies, but it's rebuttable. Taser clearly had significant evidence in this summary judgment record that an express chest shot warning would not have altered Officer Baird's conduct. Now, make no mistake that the officer's conduct in this case was reprehensible, and it was against all training and warning instructions that Taser gave. It was also against the express use of force policy by this police department, which clearly held or stated that officers were to exhaust empty, soft, and hard-handed control techniques before resorting to the use of force and the use of a taser device. They didn't do that here.  And therefore, because of that testimonial admission, all of the other officers took the fifth, and the city settled this case for $2.4 million that this plaintiff has already received. That's where the liability is appropriate, not with Taser for a failure to warn. Any officer that doesn't comply with its own department's use of force policy, there's no reason to believe they would apply with a manufacturer's product warning. You have here four officers who were on scene at a routine traffic stop for speeding. Two of these officers already had hands on Mr. Harlan. There was no need for this device to ever be used in those circumstances. Those officers should have just simply taken him down. He was only 5'9", 173 pounds. All of these officers outsized him. This is not the type of a situation in which a taser ECD should be used, and that's why the city settled. That was an evident situation. But Taser had a number of express warnings in addition to the violation of the department's policy that this officer violated. Taser's training was very specific, and Sergeant Link even testified that he was always trained that you target the back whenever possible, and that he trained his officers in that way. But there's no evidence here that Officer Baird couldn't have taken a back shot instead of a chest shot when you've got four officers on site. Taser also specifically trained officers that if you have a close deployment within 7 feet, which this was within 2 feet, you target the waist area. You don't target the chest. You place one probe below, and it's called split the belt line. And for close probe shots, that's the target zone. He didn't do that either. Is that in the written materials that they didn't look at? Yes. Or were there other training sessions? In version 13, that's where the split the belt line and the back shots and all of those different types of things were in that training material that Officer Baird never saw. And so there also was specific warnings about do not use continuous, repeated, or extended deployments. That's really important, and I would direct this court to the Ninth Circuit's 2012 decision in the Marquez case in which they held that the exact same version of the warnings at issue in this case, the March 1, 2007 warnings document, was adequate as a matter of law to warn of the risks of death associated with multiple deployments. And that's what happened here. I mean, not only did they use this product inappropriately, they used it three times. He pulled the trigger three different times. Now, the TASER device has a five-second cycle, and then it shuts off. The officer can extend that cycle by holding down the trigger, which is what this officer did. The first shot was 21 seconds. Four officers, two already holding on to him. There's no justification for that. And so you've got two extended applications and three applications total. Those officers are supposed to use that five-second cycle as a window of opportunity to go hands-on with the suspect during the power while they're incapacitated to get them under control so you don't have to use multiple applications. And so TASER had specific warnings about that and don't do that, and they have been held adequate as a matter of law to warn of risks of death, which is what happened here. And in addition to that, there was an express warning, and I think this is key to the fact that the officer would never have complied with an additional warning. TASER had a warning in its Version 13 training materials, which we put in our addendum, that said to avoid applications directly across the chest because they may cause sufficient muscle contractions to impair normal breathing patterns. Now, it wasn't a cardiac warning, but it was a warning about the device interfering with the muscles of respiration that can prevent breathing, and that was directly associated with chest shots. And so there were warnings, as Judge Loken said. This is not a no-warnings case. There's a lot of warnings here. There's a lot of warnings that apply to this specific situation that were not utilized and were violated here. Relating to the expert testimony, I would refer this Court to its 2007 decision in the men's case, MENZ. In that case, which was also a Judge Jean Hamilton decision on summary judgment, that she cited as support for her ruling here. And that case, really, the analysis and the various rulings that Judge Hamilton used in this case were exactly affirmed in the MENZ decision. That was a product liability case involving both strict liability and negligence claims and involving both warnings and design defect claims. And she granted summary judgment in that case, and she also held that warnings experts were required both in the warnings and the product defect area, and that was deficient. Do you have any Eighth Circuit cases that have that requirement? That is an Eighth Circuit case. The Eighth Circuit affirmed her and held in the MENZ case. Okay, there's MENZ I and MENZ II, so you're referring to the... Right. She held that expert testimony was necessary, and this Court affirmed her and said it was not an abuse of discretion for her to determine that expert testimony was necessary when you're talking about complex machinery where a lay jury does not possess the experience or knowledge of the subject matter sufficient to enable them to reach an intelligent opinion without help. And then it went on to say, but even if expert testimony weren't required, that the plaintiff in MENZ, exactly like the plaintiff here, failed to provide any other evidence whatsoever demonstrating that the warning would have altered his behavior. But that says the plaintiff didn't provide any other evidence besides expert, so would it have been a different case if there were evidence? This is that same case, Judge, because the plaintiff here didn't provide any other evidence. The plaintiff here relied only on the presumption, and once Taser, through all of the evidence I just highlighted, rebutted that, that presumption goes away. It then leaves the plaintiff with no evidence and an unsubmissible case because she has not presented any evidence to satisfy the warnings causation element of her claim. So I do really encourage you to take a look at the MENZ decision because it really is what Judge Hamilton relied on there. It supports her decision here as well. In the negligence area, the plaintiff really, I think, tries to distract this court's attention when talking about a potential post-sale duty to warn in the negligence area. This court need not reach that decision, which is uncharted waters in Missouri State Courts. This court really does not need to tread in. As I mentioned earlier, the same warnings causation element is required for negligence and is missing there as well. But as an additional independent basis, this court has acknowledged that negligence claims have a higher threshold of... Excuse me, I missed that. What we don't need to address, in your view, is what, the state-of-the-art issue or something? I missed it. Well, the state-of-the-art, Judge, is... Well, it's the one you just said. Yeah, on the negligence claim, the failure to warn claim in the negligence context. In the negligence context, there's an additional element of proof, and that is that the defendant failed to exercise reasonable care. This court has acknowledged that then that sets a higher threshold for negligence claims than for strict liability claims. And plaintiff here offered no standard of care opinions whatsoever. And Dr. Zipes didn't ever offer, in the first place, any standard of care opinions and wouldn't have been qualified to do that anyway, since he's not a manufacturer of weapons and has no law enforcement experience. Where a plaintiff seeks to hold TASER to the standard of an expert in the field, the field being the manufacturing of sophisticated electrical weapons, you need an expert to say they somehow violated some standard of care, and they don't have that either. So separate and apart from any post-sale duty to warn, which no Missouri case has hold that there is such a duty, and the Missouri Supreme Court has not adopted the restatement third, there are two separate independent basis for affirming the dismissal of the negligence claim without ever even reaching that issue. Going to your question, Judge Loken, on the state-of-the-art defense, that is a separate additional basis for affirming summary judgment for TASER on the strict liability warnings claim. That's the only claim that that defense applies to. And TASER, but the lack of warnings causation element, which is plaintiff's burden of proof, is the one that I was focusing on here this morning. But that's an additional way to affirm this case. Under the statutory defense in Missouri, if a manufacturer doesn't know and could not have reasonably discovered a risk at the time of the date of the sale, and the date of the sale clearly controls under that statute explicitly, and plaintiff admitted that in the trial court, that it's state-of-the-art and it's a complete defense. There is no evidence whatsoever, either all the stuff outlined in plaintiff's brief, which doesn't start until 2005, and Dr. Zipes, in his expert opinion, also has nothing, no notice prior to September of 2005. There's nothing that exists at the time of the sale here, which is undisputed to be in June of 2004. The Rosa decision really is an important one in this regard. It's another Ninth Circuit case separate from Marquez, but also a 2012 decision. And it addresses the same kind of notice issue in the same time frame, in this 2004 time frame. And the court there held that a manufacturer is not under a duty to warn of every report of a possible risk, no matter how speculative, conjectural, or tentative, and refused to interpret the knowability standard so broadly as to include, quote, any risk that was discoverable through modern technology, no matter how unsubstantiated. And so that really is a case that goes to the heart of the issues here. It obviously doesn't involve the same statute, but the same standards. Was it knowable at the time of sale? The plaintiff has absolutely no evidence that it was. Quickly, on the design defect part of the claim, this is a warnings case. It's not a design case. The Nestle-Rod decision, the Supreme Court of Missouri is very clear that you have to show that there's a problem with the design itself. Other than saying that the taser's warnings lacked a chest shot warning, they've never identified any design that makes it unreasonably dangerous, separate and apart from what they contend to be a lack of a warning. In the Moore case, which is a 2011 Missouri Supreme Court decision, they talk about it being a distinct claim, and that design defect theories address the situation in which a design is itself inadequate, rendering the product unreasonably dangerous without regard to whether a warning was given. They've never said that the electrical specifications or the safety issues relating to the output of the device or anything like that were somehow unreasonably dangerous. It's just simply that it lacked this warning. That's not a design case. And so they try to conflate the elements of causation, medical causation, and unreasonable dangerousness. They're two separate elements requiring separate and distinct proof. The Schaefer case, which was affirmed by this decision, specifically holds that the fact that an accident happened standing alone does not establish a product defect, and that is controlling in that claim. And so we ask that Your Honors affirm every aspect of Judge Hamilton's well-reasoned decision. Thank you. Very good. Thank you.  A little over four minutes, Your Honor. A rebuttal? Thank you very much. On this last point about the design defect case, I just wish to remind the panel that we're not conflating, that there is a separate, distinct design defect claim that we have brought, and that here, like in the cases before the Missouri courts of Stinson, of Elmore, and of Smith, no Missouri court, none of those Missouri courts, required the plaintiff to bring in an expert to describe how a cigarette was designed or works, only how it kills. We've done that here. Now, the quotation is accurate. The mere evidence of an accident is not enough to win. But we have shown specifically how this particular product can and did kill. Most of the design defect cases that talk about the need for expert testimony, talk about that need understandably in the context of causation. If I sit down at my desk and I touch my computer with my fingers and I am stunned, and I suffer physiologic collapse immediately and die, you, sir, the finder of fact, will require some expert to talk about how I died. But no expert is required to explain the design of the hardware, the hard drive, pardon me. That's the distinction here. I don't understand the design unless I think Nesselrod does say approximately what opposing counsel said. I haven't read it for a long time. But I don't understand what aspect of the product design you're linking to the unreasonable dangerousness in the record. I may not understand your question, Your Honor. I'm sorry. Well, there has to be a link between the unreasonable dangerousness and some aspect of the design. Respectfully, that's an over-reading of Missouri law. If you show the asbestos kills somebody, you don't have to go back and talk about the design of the asbestos and whether or not it insulates well. No, I mean, that's something that comes out of the ground. That's fine. What's necessary is medical causation to make the link. But in your computer example, it could have been a surge from the local power company. It could have been a lot of things. So you hire an expert. All right, so what aspect of the tape? Maybe there is none in the record. Because I have not heard from you what aspect of the design, other than a projectile comes out of the thing, is defective. Obviously, a projectile comes out. This product takes over, captures is a term of art, the heartbeat, at a rate over 1,100 beats per minute that cannot be sustained by a human being. As a result, the human being's heart collapses into a state of being called ventricular fibrillation. That's the design defect described in great detail by Dr. Zipes. The heart tries to keep up. High heart rate is called tachycardia. Even Lance Armstrong can't keep up that pace. As a result, as an inevitable result. Even with all his drugs. Your Honor? Even with all his drugs. Even with EPO. Even with human growth hormone. Cannot keep up. And so the heart collapses into a state called fibrillation, which is barely moving tremors in the heart. And at that moment, you are either shocked back into regular sinus rhythm or you go to what doctors call asystole, which is no heartbeat. And that is death. Thank you. Thank you. The case has been thoroughly and well briefed and argued, and we will take it under advisement.